MCP

FILED

8/1/2023

JH

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

MICHAEL C. MAYO

       Plaintiff,

          Case No.: 1:21-CV-05014

         Hon. M. David Weisman

V.

THOMAS DART

       Defendant.

## PLAINTIFF'S SUPPLEMENTAL PRODUCTION IN RESPONSE TO DEFENDANT'S FIRST SET OF REQUEST FOR PRODUCTION

1. Attached

# ILLINOIS GENERAL SWORN AFFIDAVIT

STATE OF ILLINOIS
COUNTY OF COOK

I, the undersigned being duly sworn do
here by depose and say:

1. I am over the age of 18 and am a resident of
the State of Illinois. I have personal knowledge of
the facts here in, and if called as a witness, could
testify competently there to.

2. FACTS: I was housed at Stateville Correctional
Center from June 1, 2010 to June 13, 2022, In
Jan. of 2019, I started seeing COVID-19 related
news on TV. In March of 2019, Stateville was
placed on lockdown and all inmate visitation
stopped.
Sometime shortly there after, the visiting
room was turned into an isolation unit to house
medically fragile prisoners from the Health
Care Unit who had certain chronic illnesses.
This was a higher level of social distancing to
further protect Stateville's most medically
fragile prisoners from contracting COVID-19.

(i)

While many of my fellow prisoners in the Health Care Unit succumbed to COVID-19 due to the lack of social distancing, I do not believe anyone from the visiting room turn isolation unit died from COVID-19.

Under penalties as provided by Illinois law, the undersigned certifies that the statements set forth in this statement are true and correct.

Signed and sworn to before me on ___7/12/23___ by
(date)

___JOSEPH SORRENTINO___          ___Joseph Sorrento___
Print (Name of person making Statement)     (Signature)

NOTARY: ___M_n Dorsey___
(Signature of Notary Public)

OFFICIAL SEAL
V DORSEY
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 7/7/2025

(2)

# COOK COUNTY DEPARTMENT OF CORRECTIONS
## INMATE PERSONAL LAUNDRY LOG

| DIVISION | TIER |
|---|---|
| 8 | 3 F |

| # | Inmate Name | Inmate ID# | LOOP# | CELL# | BOXER/BRIEF | T SHIRTS | SOCKS | TH-T | TH-B | S-TOWEL | C-TOWEL | S-FACE | C-FACE | INITIALS | SIGNATURE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Willians | 20130611130 | 6 | | | | | | | | | | | | |
| 2 | Alexander | 2022112CORl | 32 | | 1 | 2 | | | | | | | | | D Williams |
| 3 | Abbas Maya | 20811270-7 | 81 | | | 2 | | | | | | | | | Ali Maya |
| 4 | Dones HERNANDEZ | 20221040104 | 3 | | 2 | 3 | 1 | 2 | 2 | | 1 | | | | F. Hernan |
| 5 | Mullen | 2021313097 | | | | 3 | | | | | | | | | |
| 6 | Mullins | 2021313097 | 34UC | | | 5 | | 2 | 0 | | | | | | Kick Anne |
| 7 | Francisco Flores | 2022092020 | 33 | 1 | 1 | 1 | 1 | 1 | | | | | 1 | | |
| 8 | Teddy Scott | 2GAR030/001/C6 | 1 | | | 3 | | 2 | 2 | | | | 1 | | Bobby Scott |
| 9 | Drake 9 | 2021030657 | | | | | | | | | | | | | Drake 9 |
| 10 | Rockram C. | 20203057 | 040 | | 3 | 2 | 4 | 1 | 1 | | | | | | Rockram C |
| 11 | Rockram C. | 20220305057 | 0A56 | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | | |

STAR (8CS1)

OFFICER SIGNATURE: SPCGSRALL

3 BAGS

Case: 1:21-cv-05014 Document #: 51 Filed: 08/01/23 Page 5 of 28 PageID #:368

# COOK COUNTY DEPARTMENT OF CORRECTIONS
## INMATE PERSONAL LAUNDRY LOG

24 Jun 23

| DIVISION | TIER |
|---|---|
| 8 | 3F |

3 BAGS

| | Inmate Name | Inmate ID# | LOOP# | CELL# | BOXER/BRIEF | T-SHIRTS | SOCKS | TH-T | TH-B | S-TOWEL | C-TOWEL | S-FACE | C-FACE | INITIALS | SIGNATURE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | L V J Johari | 20170111112 | QT3 | | | 4 | | | | | | | | | Christina Williams |
| 2 | H. Perez | 2018021052 | 2L6 | | | | | | | | | | | | |
| 3 | Alejandro W. | 2022022058 | 12 | 35 | 2 | | 1 | 1 | 1 | | | | | | |
| 4 | BOBBY SCOTT | 2018111627 | 48 | | | 1 | 1 | 1 | 1 | 1 | 1 | | | | |
| 5 | Diego | R0840304001 | 648 | 1F | | | | | | | | | | | |
| 6 | | 2019144293 | | 2F | 2 | | 0 | 2 | 2 | 1 | 1 | | | QC | |
| 7 | | 2019082066 | L25 | 2 | 2 | 2 | 2 | 1 | 5 | | | | QC | | |
| 8 | West | 2019092082 | | 3F | 4 | | 4 | 1 | 1 | | | | | | |
| 9 | Saul Cook | 2020100205 | 1 | 3F | 3 | | 8 | 1 | 2 | 1 | | 3 | | | |
| 10 | Sylvia Conde | 20201006 | SMS | 3F | | 3 | 4 | 1 | | 1 | 1 | | | | |
| 11 | Francisco | | TSK | 1 | | | | | | | | | | | |
| 12 | Francisco Flores | 2022093002 | D-40 | | | 3 | | | | | | | | | |
| 13 | Jubob | A6417 | BJ | 3F | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | | |

ISSUING OFFICER: 2243526

STAR: 13151

SIGNATURE



456 F.Supp.3d 966
United States District Court, N.D. Illinois, Eastern Division.

Anthony MAYS, individually and on behalf of a class of similarly situated persons; and Judia Jackson, as next
friend of Kenneth Foster, individually and on behalf of a class of similarly situated persons, Plaintiffs-Petitioners,

v.

Thomas DART, Defendant-Respondent.

Case No. 20 C 2134

|

04/27/2020

**Synopsis**
**Background:** Pretrial detainees at county jail brought putative class action against sheriff, petitioning for writ of habeas corpus
and alleging § 1983 conditions-of-confinement claim under the Fourteenth Amendment based on sheriff purportedly failing to
provide detainees with reasonably safe living conditions during COVID-19 pandemic. The District Court, Matthew F. Kennelly,
J., 2020 WL 1812381, granted motion for temporary restraining order (TRO). Detainees moved for preliminary injunction.

**Holdings:** The District Court, Kennelly, J., held that:

[1] detainees were required to exhaust state remedies before seeking habeas corpus;

[2] detainees could not pursue habeas claims on representative basis;

[3] as a matter of first impression, Prisoner Litigation Reform Act (PLRA) applied to detainees' habeas corpus claim;

[4] commonality and typicality requirements were satisfied for § 1983 class action;

[5] detainees satisfied requirement that sheriff acted or refused to act on grounds that applied generally to the class;

[6] requested transfer was "prisoner release order" within meaning of Prisoner Litigation Reform Act (PLRA) permitting entry
of prisoner release order only by three-judge court;

[7] court would not request convening of three-judge court;

[8] detainees showed likelihood of irreparable harm without a preliminary injunction; and

[9] balance of harms favored granting preliminary injunction.

Motion granted in part and denied in part.

**Procedural Posture(s):** Petition for Writ of Habeas Corpus; Motion for Preliminary Injunction.

A court may excuse exhaustion of state remedies by habeas petitioner where (1) requiring exhaustion of administrative remedies causes prejudice, due to unreasonable delay or an indefinite timeframe for administrative action; (2) the agency lacks the ability or competence to resolve the issue or grant the relief requested; (3) appealing through the administrative process would be futile because the agency is biased or has predetermined the issue; or (4) substantial constitutional questions are raised. 28 U.S.C.A. § 2241.

[9]    **Habeas Corpus** ⬥ Exhaustion of State Remedies

Pretrial detainees in jail with COVID-19 outbreak were required to exhaust state remedies of judicial review of bonds and appeal of any denial of motion to reduce bond before seeking habeas corpus; state courts were available for emergency matters, public defender's affidavit describing length of appeal process in ordinary circumstances did not show length of appellate process for medically vulnerable detainee claiming immediate risk of serious health consequences unless bail was reduced during coronavirus pandemic, court had no reason to believe that Illinois Appellate Court would refuse to deal with appeal promptly, and bond reduction remedy was not shown to be any less effective than federal remedy. 28 U.S.C.A. § 2241; 725 Ill. Comp. Stat. Ann. 5/110-5, 5/110-6; Ill. Sup. Ct. R. 604(c).

[10]   **Federal Civil Procedure** ⬥ Common interest in subject matter, questions and relief; damages issues

**Habeas Corpus** ⬥ Representative or class actions

Rule governing class actions does not apply to habeas corpus proceedings, but representative actions analogous to class actions on rare occasions can be brought in habeas corpus proceedings, and their claims must depend upon a common contention for which the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke. Fed. R. Civ. P. 23.

1 Case that cites this headnote

[11]   **Federal Civil Procedure** ⬥ Common interest in subject matter, questions and relief; damages issues

Commonality necessary for a class action or representative proceeding requires the plaintiffs to demonstrate that the class members have suffered the same injury, and their claims must depend upon a common contention for which the determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke; thus what matters is not the raising of common questions, but the capacity of a representative proceeding to generate common answers apt to drive the resolution of the litigation. Fed. R. Civ. P. 23(a)(2).

[12]   **Federal Civil Procedure** ⬥ Common interest in subject matter, questions and relief; damages issues

Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question. Fed. R. Civ. P. 23(a)(2).

[13]   **Habeas Corpus** ⬥ Representative or class actions

Commonality requirement was satisfied for pretrial detainees' representative action seeking habeas corpus on ground that coronavirus presented so severe a risk of harm to some people in sheriff's custody that it was unconstitutional to confine them in the jail, even if habeas corpus relief that would require individual proceedings or determinations; members of class all experienced the alleged harm from sheriff's response to coronavirus in the same or similar ways, specifically their allegedly increased risk of exposure to the virus. Fed. R. Civ. P. 23(a)(2).

3 Cases that cite this headnote

[20] **Habeas Corpus** 🔗 Petitions by state or territorial prisoners in general

**Habeas Corpus** 🔗 Questions of local law

Writ of habeas corpus is a federal remedy that does not depend on state law and cannot depend on subsequent decisions by a detained person's custodian. 28 U.S.C.A. § 2241.

[21] **Federal Civil Procedure** 🔗 Prisoners and inmates

Commonality requirement was satisfied for pretrial detainees' § 1983 class action alleging that coronavirus presented so severe a risk of harm to some people in sheriff's custody that it was unconstitutional to confine them in the jail; members of class all experienced same injury. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 23(a)(2).

[22] **Federal Civil Procedure** 🔗 Prisoners and inmates

Pretrial detainees' § 1983 class action alleging that coronavirus presented so severe a risk of harm to some people in sheriff's custody that it was unconstitutional to confine them in the jail satisfied typicality requirement for class action as each member's claim arose from sheriff's response to the coronavirus pandemic, the same event or practice or course of conduct, and was based on the same legal theory. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 23(a).

[23] **Declaratory Judgment** 🔗 Representative or class actions

**Federal Civil Procedure** 🔗 Prisoners and inmates

Pretrial detainees' § 1983 class action challenging conditions of jail confinement during COVID-19 pandemic satisfied requirement that sheriff acted or refused to act on grounds that applied generally to the class, thereby making final injunctive or declaratory relief appropriate with respect to class as whole, where detainees requested single order mandating social distancing and/or extending temporary restraining order (TRO) or converting it to a preliminary injunction, which would provide the same relief to each class member. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 23(b)(2).

[24] **Constitutional Law** 🔗 Custody or restraint; special relationship

When a state actor deprives a person of his ability to care for himself by detaining him, it assumes an obligation under the due process clause to provide some minimum level of well-being and safety. U.S. Const. Amend. 14.

[25] **Constitutional Law** 🔗 Conditions

The due process clause requires a jailer to provide a pretrial detainee with food, shelter, and basic necessities, including reasonably adequate sanitation, ventilation, bedding, hygienic materials, and utilities, and to meet the person's medical needs while in custody. U.S. Const. Amend. 14.

[26] **Constitutional Law** 🔗 Conditions

The due process clause protects pretrial detainees, who have not been convicted of anything, from conditions that amount to punishment. U.S. Const. Amend. 14.

In determining reasonableness of sheriff's actions to protect pretrial detainees from COVID-19 during coronavirus pandemic and comply with due process clause, court had to account for his legitimate interest in managing the jail facilities and defer to policies and practices that were needed to preserve internal order and discipline and to maintain institutional security. U.S. Const. Amend. 14.

[35] **Constitutional Law** ◆ Safety and security

Although a jailer must make a reasonable effort to abate conditions that pose an excessive risk to the health or safety of the people in his custody, the fact that he fails to prevent actual harm does not mean that his response was unreasonable under due process clause. U.S. Const. Amend. 14.

[36] **Constitutional Law** ◆ Safety and security

Due process clause does not require a detention facility to provide foolproof protection from infection by a communicable disease. U.S. Const. Amend. 14.

[37] **Constitutional Law** ◆ Safety and security

**Prisons** ◆ Care, Custody, Confinement, and Control

Sheriff's compliance with Centers for Disease Control (CDC) guidelines on social distancing during coronavirus pandemic was not dispositive of pretrial detainees' due process challenge to conditions of confinement, but guidance from CDC was beneficial in assessing objective reasonableness of sheriff's conduct in the face of an ongoing outbreak. U.S. Const. Amend. 14.

3 Cases that cite this headnote

[38] **Civil Rights** ◆ Criminal law enforcement; prisons

Pretrial detainees seeking preliminary injunction on social distancing during coronavirus pandemic were reasonably likely to succeed on their contention that group housing or double celling of detained persons was objectively unreasonable under due process clause given the immediate and significant risk to life and health from transmission of coronavirus, except in the following situations: persons detained in tiers or dormitories under quarantine following positive test, persons who had tested positive, recovering persons, persons at risk for suicide or self harm in single cell, persons in dormitory at less than half capacity, and persons in group housing unit with insufficient space. U.S. Const. Amend. 14.

[39] **Civil Rights** ◆ Criminal law enforcement; prisons

Pretrial detainees seeking preliminary injunction on social distancing during coronavirus pandemic were reasonably likely to succeed on their contention that it was objectively unreasonable under due process clause to effectively preclude social distancing for detainees with conduct issues or detainees under Prison Rape Elimination Act (PREA). U.S. Const. Amend. 14; 34 U.S.C.A. § 30301 et seq.

[40] **Civil Rights** ◆ Criminal law enforcement; prisons

Pretrial detainees seeking preliminary injunction on advance identification of detained persons especially vulnerable to severe illness or death during coronavirus pandemic were unlikely to establish sheriff's objective unreasonableness under due process clause; any person with symptoms consistent with coronavirus disease was already provided

**[47]** **Federal Courts** 🔑 Imprisonment and incidents thereof

Federal judge making sua sponte request to convene a three-judge panel under Prisoner Litigation Reform Act (PLRA) need not consider the likelihood of whether a three-judge court would issue a prisoner release order. 18 U.S.C. § 3626(a)(3)(D).

**[48]** **Prisons** 🔑 Judgment and relief

Temporary restraining order (TRO) requiring sheriff to establish and implement policies regarding coronavirus testing and sanitation in jail, implement social distancing during the new detainee intake process, provide adequate soap and/or hand sanitizer and sanitation supplies, and provide face masks to all detained persons who were quarantined satisfied previous order requirement for entry of prisoner release order under Prisoner Litigation Reform Act (PLRA); TRO failed to remedy overall claimed constitutional violation of deficient conditions during COVID-19 pandemic. 18 U.S.C.A. § 3626(a)(3)(A)(i).

**[49]** **Civil Rights** 🔑 Judgment and relief in general

The previous order requirement before entry of prisoner release order under Prisoner Litigation Reform Act (PLRA) is satisfied if the court has entered one order that failed to remedy the constitutional violation; court is not required to attempt all possible steps short of release before requesting the convening of a three-judge court, and the PLRA does not require a previous order involving a particular type of remedy, but simply requires a previous order that attempted but failed to remedy the constitutional deprivation itself. 18 U.S.C.A. § 3626(a)(3)(A)(i).

**[50]** **Prisons** 🔑 Judgment and relief

Each new order must be given a reasonable time to succeed before three-judge court can enter prisoner release order under Prisoner Litigation Reform Act (PLRA) , and reasonableness must be assessed in light of the entire history of the court's remedial efforts. 18 U.S.C.A. § 3626(a)(3)(A)(ii).

**[51]** **Federal Courts** 🔑 Application for such court and determination

A court may request the convening of a three-judge court under Prisoner Litigation Reform Act (PLRA) even while its remedial efforts are ongoing; otherwise, a court unreasonably would have to impose a moratorium on new remedial orders before a three-judge court considers the issuance of a prisoner release. 18 U.S.C. § 3626(a)(3)(D).

**[52]** **Civil Rights** 🔑 Judgment and relief in general

Sheriff did not have reasonable time to comply with court orders to protect pretrial detainees' constitutional rights during coronavirus pandemic, and, thus, court would not request convening of three-judge court under Prisoner Litigation Reform Act (PLRA); sheriff complied with temporary restraining order (TRO) and made additional efforts to spread out detainees within the jail, and court was ordering additional relief with a different and focused approach. 18 U.S.C. §§ 3626(a)(3)(A)(ii), 3626(a)(3)(D).

**[53]** **Prisons** 🔑 Judgment and relief

Balance of harms favored granting preliminary injunction against sheriff to require additional measures to curb spread of coronavirus among pretrial detainees in jail by testing, social distancing, sanitation, face masks, quarantine, isolation, use of convalescent tiers, and limits on dormitory capacity; conditions posed unreasonable risk of serious harm to pretrial detainees' health, despite sheriff's laudable strides since court issued the temporary restraining order (TRO), detainees far surpassed burden of demonstrating better than negligible likelihood of success on the merits, and public interest in containing the spread of coronavirus further tipped balance in favor of injunctive relief.

**Attorneys and Law Firms**

**\*974** Alexa Van Brunt, Locke E. Bowman, III, MacArthur Justice Center, Steven Grimes, Thomas Francis McAndrew, Winston & Strawn LLP, Stephen H. Weil, Sarah Copeland Grady, Loevy & Loevy, Chicago, IL, Alec Karakatsanis, Pro Hac Vice, Next Charles Lewis Gerstein, Pro Hac Vice, Civil Rights Corps, Washington, DC, for Plaintiffs-Petitioners.

James Matthias Lydon, Robert Thomas Shannon, Adam Robert Vaught, Gretchen Harris Sperry, Lari Ann Dierks, Hinshaw & Culbertson LLP, Chicago, IL, for Defendant-Respondent.

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge: [1]

Anthony Mays and Kenneth Foster, both of whom are detained at Cook County Jail while awaiting trial on criminal charges, have sued Cook County Sheriff Thomas Dart, who operates the Jail, on behalf of a class of similarly situated persons. Mays and Foster allege the Sheriff has violated the constitutional rights of persons detained at the jail by failing to provide them with reasonably safe living conditions in the face of the current coronavirus pandemic. They assert claims under 42 U.S.C. § 1983 and for writs of habeas corpus under 28 U.S.C. § 2241.

On April 9, 2020, the Court granted the plaintiffs' motion for a temporary restraining order in part. The Court directed the Sheriff to: (1) establish and implement, within two days' time, a policy requiring prompt coronavirus testing of detained **\*975** persons with symptoms consistent with coronavirus disease; (2) within two days' time, eliminate the use of "bullpens" to hold groups of new detainees during the intake process; (3) begin to provide inmates and staff, within one day, soap and/or hand sanitizer sufficient to enable them to frequently clean their hands, and sanitation supplies sufficient to enable them to regularly sanitize surfaces in areas used in common; (4) establish and carry out, within two days' time, a policy requiring sanitation of all such surfaces between each use; and (5) within three days' time, distribute facemasks to all detained persons quarantined due to their exposure to a person exhibiting symptoms consistent with coronavirus disease. The Court overruled the plaintiffs' request for additional temporary relief, including a mandate for implementation of "social distancing" throughout the Jail and to provide facemasks to every detained person. The Court also concluded that the plaintiffs seeking habeas corpus relief had failed to exhaust available state court remedies.

The plaintiffs have now moved for entry of a preliminary injunction and other relief. They again seek writs of habeas corpus, based on newly discovered facts that they contend provide a basis to excuse their failure to exhaust state court remedies. They also seek conversion of the temporary restraining order to a preliminary injunction, and they again request an order requiring implementation of social distancing throughout the Jail, as well as transfer of detained persons from the Jail to other locations within the Sheriff's control, including electronic home monitoring. The plaintiffs also request the convening of a three-judge court under the Prison Litigation Reform Act to consider entering a "prisoner release order" within the meaning of that statute.

The effect of the stay-at-home orders imposed in Illinois and most other states, along with advice by national officials to limit contacts and group activities, has been dramatic: schools have been closed; commercial establishments and workplaces have ceased operations, resulting in massive job losses; public events have largely been cancelled; and access to public spaces has been limited or barred entirely. Entire sectors of the national economy have slowed to a snail's pace. Society has paid a very high price to curb the spread of this highly contagious virus.

### B. Operation of the Cook County Jail

The Sheriff runs the Cook County Jail. As the Court stated in its written decision on the plaintiffs' motion for a temporary restraining order (TRO), the Jail is "a very large physical facility—actually a campus of separate physical facilities—whose population, **\*977** if one considers including both detainees and staff, is the size of a small (but not all that small) town." *Mays*, 453 F.Supp.3d at 1083. Managing the Jail is extraordinarily challenging because of the size of its population and physical facilities, the diverse needs of the detainees, the Sheriff's public safety obligations, and his obligations to the criminal justice system. The Sheriff's public safety obligations require him to consider the appropriate custodial conditions for each detained person. As the Court has noted, the Jail's population "runs the gamut from persons with lengthy criminal records who are accused of committing violent crimes to non-violent offenders in custody for the first time who, perhaps, remain in custody only because they and their families were unable to post bond money." *Id.* And the Sheriff's obligations to the people in his custody, most of whom are detained awaiting trial on crimes for which they are therefore entitled to a presumption of innocence, require him to provide care sufficient to account for each individual's physical and mental health conditions. This is no small task, particularly given that populations in custody are statistically more likely to have adverse health conditions, both physical and mental.

Adding an infectious disease outbreak to these conditions further complicates the difficult challenge of managing the Jail. The very nature of the Jail's setup and day-to-day operations facilitates rapid transmission of communicable diseases like the one caused by the coronavirus. First, the Jail's physical facilities are designed to accommodate large populations, all densely housed, and many in congregate settings. In particular, the Jail has many so-called "dormitory" units, which in normal times may house as many as hundreds of detained persons in a single room with closely-spaced bunk beds.

Second, the Jail is a closed environment with many spaces used in common. Persons detained there—even those housed in single-occupancy cells—do not have individual bathing facilities; toilets are typically used in common; they eat in groups under normal circumstances; and they come into contact with each other and with correctional officers in other common areas. And even when confined, detainees are in close proximity, in adjoining cells and in tiers that use a common ventilation system.

Third, the routine operations of the Jail require high levels of movement of people. Detained persons must be escorted from their cells to common areas like shower and bathroom facilities. In normal times they are escorted to court hearings and recreational areas (all or nearly all of which have come to a stop). Finally, large numbers of staff personnel, as well as vendors, move in and out of the Jail and its various areas on a daily basis. In doing so, these individuals have contact with other members of the community at large, who themselves may have contracted coronavirus. Thus staff members and contractors potentially can carry the virus both into and out of the Jail.

Limiting exposure to the coronavirus in the Jail is therefore a significant challenge. Infection rate data reflects that it has been challenging to effectively curb transmission of the highly infectious coronavirus in the setting of the Jail. As of April 6, 2020, the infection rate within the Jail was an order of magnitude higher than the rate of infection in Cook County. *Mays*, 453 F.Supp.3d at 1091–93. And on April 8, 2019, the New York Times reported that, at that time, the Jail was the largest-known source of coronavirus infections in the United States. See Timothy Williams and Danielle Ivory, *Chicago's Jail Is Top* **\*978** *U.S. Hot Spot as Virus Spreads Behind Bars* (April 8, 2020), N.Y. Times, https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html (last updated April 23, 2020).

such as shower facilities; (5) establish a policy requiring frequent sanitation of these areas; and (6) provide facemasks to all detained persons in quarantine. *Mays*, 453 F.Supp.3d at 1099–1101.

The Court denied several of the plaintiffs' requests for relief. They sought an order mandating social distancing throughout the facility, not just at intake, arguing that this was one of the critical outbreak control measures outlined in the CDC Guidelines. *Id.* at 1094–95. The Court declined to mandate social distancing beyond intake, reasoning that there are space constraints at the Jail and the Guidelines expressly recognized that social distancing may not be feasible in a correctional facility. *Id.* The Court also declined the plaintiffs' request for direct screening of medically vulnerable detainees before they show symptoms of infection, also because the CDC Guidelines did not mandate this. *Id.* In addition, the Court denied the plaintiffs' request to require the Sheriff issue facemasks to every detained person, as the CDC Guidelines recommended this only for those who had come into contact with a symptomatic individual. *Id.* at 1096–97, 1000–01. Finally, the Court declined the plaintiffs' request to transfer the members of subclass B to a safe facility or other forms of custody, because the plaintiffs had failed to show that the other protective measures that the Court had ordered would be inadequate to protect detained persons from the health risks associated with the coronavirus outbreak. *Id.* at 1100–01. The Court also declined subclass A's request for emergency writs of habeas corpus, concluding that they had failed to exhaust available state court remedies. *Id.* at 1088–90.

### B. The Sheriff's response and current conditions at the Jail

#### 1. April 13 status report

On April 13, pursuant to the Court's direction, the Sheriff filed a status report regarding compliance with the TRO. First, with respect to the directive to test symptomatic detainees, the Sheriff reported that Cermak Health Services, an arm of Cook County that provides healthcare to persons detained at the Jail, maintains the supplies for medical testing and actually administers such tests. [4] According to the **980** Sheriff, Cermak had determined that it would not be medically appropriate to test all detained persons in quarantine. The Sheriff therefore instructed his personnel to isolate and refer symptomatic detainees to Cermak for further evaluation and testing.

As to the order to maintain social distancing during the Jail's intake process, the Sheriff implemented a modified procedure that maintains six feet of distance between all detained persons awaiting intake and provides them with facemasks. Use of the bullpens was discontinued.

Regarding the order to distribute facemasks, the Sheriff stated that he had acquired and on hand sufficient surgical masks to distribute to all quarantined detainees and employees and that he was continuing his efforts to obtain additional masks. Additionally, the Sheriff was in the process of procuring cloth masks that would be available to any detained person who requested one.

The Sheriff further reported that on April 9, he delivered approximately 28 gallons of hand sanitizer and 980 bars of soap for distribution in the Jail. He also ordered distribution of soap and sanitizer twice per week going forward. The Sheriff noted concern that some detained persons may use the soap or hand sanitizer as a weapon and that some might try to consume hand sanitizer. These considerations required the Sheriff to determine on a detainee-by-detainee basis whether to distribute hand sanitizer or soap.

With respect to the sanitation-related directives in the TRO, the Sheriff reported that he had distributed cleaning supplies to staff and detained persons on April 10. He also issued a sanitation policy to ensure that frequently touched areas such as doorknobs and phones are sanitized between uses. He issued another a policy requiring each living unit officer to ensure that surfaces are routinely cleaned and sanitized during the officer's shift. Additionally, the Sheriff stated that he was planning to hire an independent contractor to professionally clean the Jail.

#### 2. April 17 updates from the Sheriff

In anticipation of the preliminary injunction hearing, the plaintiffs submitted a **982** number of affidavits identifying problems or deficiencies in the Sheriff's compliance with the directives in the TRO. These affidavits were from individuals who had spoken to detained persons between April 14 and April 18, and they described these persons' current experiences at the Jail. According to these affidavits, symptomatic individuals are not being tested. Additionally, although facemasks are now being distributed, detainees reported, it is not happening regularly.

The detained persons discussed in the affidavits also reported inadequacies in cleaning and sanitation practices at the Jail. Several stated that detained persons lack cleaning supplies for their individual cells and that some common spaces lack cleaning supplies as well. And even where cleaning solution is available, they reported, cloths or wipes have not been provided to enable use of the solution. A number of detainees also reported that commonly used objects, such as telephones, are not being sanitized between uses. In addition, they stated, the Jail's staff has not been cleaning cells, and some common areas are cleaned only every other day, meaning they stand uncleaned despite multiple uses and repeated touching by numerous detained persons and potentially staff personnel.

The detainees also reported an inability or great difficulty in practicing social distancing. In common areas where detained persons eat, several stated, it has been impossible to practice social distancing due to the arrangement of picnic-style benches. Tape or paint markings have been placed on the floor in some dayrooms to designate appropriate space for social distancing, but, they reported, some correctional officers have mocked the practice of social distancing, and many have failed to enforce it. By way of example, detained persons have been using, at the same time, telephones that are spaced only two feet apart.

### C. The renewed preliminary injunction motion

In their renewed motion for a preliminary injunction, filed on April 14, 2020, the plaintiffs contend that the Sheriff's efforts in response to the TRO "have not worked and cannot work to abate the spread of the disease" caused by the coronavirus. Pls.' Renewed Mot. for Prelim. Inj. (dkt. no. 55) at 4. The plaintiffs focus primarily on two inadequacies of the Sheriff's efforts to date: failure to identify and transfer medically vulnerable detainees out of the Jail, and insufficient social distancing, which, the plaintiffs contend, "is the *only* way to prevent intolerable risk to [their] health and lives." *Id.* at 2.

The plaintiffs request the following in their renewed motion for a preliminary injunction. First, they ask for a preliminary injunction ordering the Sheriff to mandate social distancing throughout the Jail. In support of this request, the plaintiffs have submitted the declaration of Dr. Gregg Gonsalves, an epidemiologist at the Yale School of Medicine and School of Public Health, who opined that social distancing is "the only way to prevent further, essentially uncontrolled, spread of the virus" in the Jail. *Id.*, Ex. G (dkt. no. 55-7) ¶ 29. In the alternative, the plaintiffs argue that if the Court concludes that additional social distancing is not possible, an order should be entered requiring the Sheriff to transfer detained persons to another safe facility, or the Court should request convening a three-judge panel with the authority to order the release of detainees, as required under the Prison Litigation Reform Act. *See* 18 U.S.C. § 3626(a)(3)(B). In addition, subclass A has **983** renewed its request for issuance of emergency writs of habeas corpus. [5]

In response, the Sheriff argues that he has sufficiently addressed the risks to the health of persons in his custody, in accordance with constitutional requirements, through the protective measures he has already implemented; his efforts were consistent with the recommendations in the CDC Guidelines; and he has taken substantial steps to implement social distancing. The Sheriff also appears to contend that further implementation of social distancing was not realistically possible in the Jail at this time. In response to the plaintiff's contention that the Sheriff has not adequately abated the risk of infection to medically vulnerable detainees, he argues that he cannot screen such individuals, because he does not have access to detained persons' health information. Furthermore, the Sheriff has explained, he already refers all medical complaints and issues to Cermak, and nothing more on his part is required to satisfy the requirements of the Fourteenth Amendment.

In their reply brief, the plaintiffs acknowledge that the Sheriff has taken "dramatic steps" to increase social distancing in the Jail. Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 6. They contend, however, that these efforts have

individuals and keep them protected as we need to under the PREA Act so that those individuals are not vulnerable in other areas while they're incarcerated." April 23, 2020 Tr. at 46–47. Again, however, Miller did not explain this.

Miller supplemented his testimony with an updated spreadsheet showing the occupancy of the Jail's housing units as of April 23. This spreadsheet showed that the capacity of almost every tier that was not in Cermak, the RTU, or under quarantine was fifty percent or below. However, in Division 2, Tier D1-D was at eighty-one percent capacity, and Tier D4-R was at fifty-nine percent (Tier D3-B was right at fifty percent). A number of Cermak and RTU tiers had occupancy rates as high as ninety-seven or one hundred percent.

On cross examination, the plaintiffs' counsel asked Miller about the high occupancy levels in certain Cermak and RTU tiers reported in the April 17 and April 22 **985** spreadsheets. Miller explained that Cermak needed to house those individuals together to be able to provide them with access to care at all hours of the day or night. Miller acknowledged that social distancing was not possible for those housed in the Cermak and RTU tiers.

Plaintiffs' counsel also asked Miller about a high occupancy rate listed in the April 17 spreadsheet for a tier (referenced above) that was not in Cermak, the RTU, or under quarantine: Tier D of Dorm 1 in Division 2, which was then at eighty-one percent capacity. The April 22 spreadsheet showed that the dorm was still at the same capacity. Miller stated: "There's another security level and/or issue with having this many people on this tier that we've had to abide by." *Id.* at 31. He did not clarify the nature of the security issue. Miller acknowledged that social distancing was not possible for detainees on that tier.

When the Court asked Miller if there was still room at the Jail to move more detainees out of dorms and into cells, Miller responded, "I do have a plan in my back pocket." *Id.* at 57. He explained that he was working on moving people out of Dorms 1, 2, and 3. He added that the Jail is considering reconfiguring housing arrangements on tiers for detainees who are women to see if there is a way to create more capacity, presumably to disperse the much larger population of detainees who are men.

As for cleaning and sanitation of common areas, Miller reported that detainees have been given the supplies they need to do sanitation; he attributed shortfalls in sanitation to their own behavior. For example, he stated, at each microwave stations and shared showers and toilets, detained persons have been provided cleaning solution so that they can sanitize the facility prior to use.

Finally, Miller stated, to ensure implementation of its response measures, such as sanitation of common areas or use of PPE, the Sheriff has deployed "audit teams" that oversee these efforts. For example, the Jail has a PPE audit team that patrols PPE use and educates staff members and detained persons who are not using PPE properly.

Plaintiffs called as their hearing witness Dr. Homer Venters, a medical doctor with over a decade of experience in correctional health. Dr. Venters is the former Deputy Medical Director of the New York City Jail Correctional Health Service, a position in which he oversaw care of detainees and medical policies governing care in New York City's twelve jails. He had previously submitted a declaration along with plaintiffs' preliminary injunction reply brief. At the hearing, he testified that, in his view, the Jail's coronavirus response efforts have three key deficiencies: (1) lack of a cohesive coronavirus response plan; (2) failure to screen for individuals at higher risk of experiencing severe health consequences from a coronavirus infection; and (3) insufficient social distancing.

First, Dr. Venters explained that having a cohesive plan, rather than a collection of policy documents that address different aspects of emergency response, is a critical first step to addressing an outbreak of a communicable disease in a jail facility. He stated that because jails are such complex systems, employing and housing several thousand people, it is not possible to respond to a large outbreak without a single, coordinate plan that coordinates response measures implemented by security, health, and administrative staff.

virus over the course of the following month. This example, Dr. Mohareb, said, reflects that in the context of a congregate living arrangement like a cruise ship, hand hygiene and cabin cell isolation are insufficient to control the transmission of the coronavirus. He stated that a jail, which is similarly a congregate environment, "constitutes an equal or greater risk setting to that of a cruise ship." *Id.*

Dr. Mohareb explained that because respiratory droplets emitted by an infected person can travel up to six feet and be inhaled by another, social distancing is "a necessary intervention to prevent the spread of infection" from the coronavirus. *Id.* at 3, 6. He emphasized that social distancing is particularly important because an infected person may be mildly symptomatic or not symptomatic at all. Dr. Mohareb also noted that numerous authoritative bodies, including the CDC, the World Health Organization, and the Infectious Diseases Society of America, have recommended social distancing to control the transmission of coronavirus. He added that mathematical modeling supports a conclusion that social distancing is "the primary means by which individuals can be safely protected from the threat of COVID-19." *Id.* at 5.

All of the plaintiffs' expert affidavits emphasized the critical need to implement social distancing in order to meaningfully control the spread of the virus. Gonsalves Dec. ¶ 29 (social distancing is the "only way" to control outbreak); *see also* Rasmussen-Torvik Dec., Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj., Ex. C (dkt. no. 64-4) ¶ 9. They reiterated Dr. Venters's point that the very design of a correctional facilities promotes transmission of the coronavirus because it densely packs large groups of people together. Dr. Gonsalves stated that although correctional facilities are like cruise ships in that they are enclosed environments, they present an even higher risk of rapid transmission of the coronavirus because of "conditions of crowding, the proportion of vulnerable people detained, and often scant medical care resources." Gonsalves Dec. ¶ 17. In a joint declaration, five medical doctors with experience working in a correctional setting—including three doctors who had worked at the Jail —similarly observed that the "crowded congregate housing arrangements" of jails and prisons promote the transmission of respiratory illnesses like the coronavirus disease. Med. Profs.' Dec. (dkt. no. 1-2) ¶ 24

Beyond providing additional support for the points in Dr. Venters's testimony, the plaintiffs' other medical and public health experts added that the risks of severe health consequences from a coronavirus  **\*988**  infection are not limited only to those who have preexisting medical conditions or are over the age of sixty-five. According to Dr. Gonsalves, "young and healthy individuals may be more susceptible than originally thought." Gonsalves Dec. ¶ 5. He reported that in March, the CDC reported that one-fifth of infected people between the ages of twenty to forty-four had been hospitalized. Dr. Mohareb also stated that "a fraction of patients with COVID-19 in all groups go on to develop severe respiratory disease." Mohareb Dec. at 1.

At the conclusion of the April 23 preliminary injunction hearing, the Court extended the TRO, which was set to expire that day, pending its ruling on the motion for a preliminary injunction.

## Discussion

**[1]    [2]    [3]** "A preliminary injunction is an extraordinary remedy." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044 (7th Cir. 2017). A court's determination of whether to issue a preliminary injunction or temporary restraining order involves a two-step inquiry, with a threshold phase and a balancing phase. *Id.* First, the party seeking the preliminary injunction has to make a threshold showing, which has three elements: (1) reasonable likelihood of success on the merits of the claim; (2) irreparable harm to the movant absent preliminary injunctive relief; (3) lack of adequate remedies at law. *Id.* If the movant makes the threshold showing, the court proceeds to the balancing step, in which it determines "whether the balance of harm favors the moving party or whether the harm to other parties or the public sufficiently outweighs the movant's interests." *Id.*

Because they request relief that changes the status quo or requires the Sheriff to take affirmative action, the plaintiffs are requesting what is sometimes referred to as "mandatory" preliminary injunctive relief. *See Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997); *O'Malley v. Chrysler Corp.*, 160 F.2d 35, 37 (7th Cir. 1947); *cf. Schrier v. Univ. Of Co.*, 427 F.3d

Circuit Court's Criminal Division issued an order setting out an expedited bond hearing process that applied to seven designated classes of detained persons. Def.'s Resp. to Mot. for TRO, Ex. E (dkt. no. 31-1) at 1–2. The seven classes included those at an elevated risk of contracting coronavirus due to their ages or underlying medical conditions—that is, the putative members of subclass A. *Id.* The expedited hearings took place from March 24 through March 27. *Id.* at 3–5. Although the expedited hearings do not appear to be currently ongoing, Cook County's courts are still available for emergency matters, and judges are hearing motions to review or reduce bail daily at all locations where court is held. Def.'s Supp. Resp. to Mot. for TRO, Ex. A (dkt. no. 41-1) at 1.

In the TRO decision, the Court concluded that the plaintiffs—who both were named as representatives of subclass A—could not show that they exhausted available state remedies before petitioning for habeas corpus because they did not "contend that they sought expedited bond hearings or initiated any sort of state proceedings **\*990** challenging their bonds." *Mays*, 453 F.Supp.3d at 1088. The Court declined to excuse exhaustion because it found that the state's existing bond reduction process is "anything but futile"; the plaintiffs did not show that the process is "unduly time-consuming in a way that undermines their claimed constitutional rights"; and they did not show that state courts cannot remedy the type of constitutional violations they raise. *Id.*

After the Court issued its decision, the plaintiffs' counsel learned that Foster had sought release in the Circuit Court of Cook County through an expedited bond hearing. (The plaintiffs do not contend that Mays separately sought release in state court prior to the filing of this lawsuit.) Foster is charged with domestic battery, robbery, and unlawful restraint. Pls.' Renewed Mot. for Prelim. Inj., Ex. F (dkt. no. 55-6) at ECF p. 3 of 17. His bail was set at $50,000, requiring him to post $5,000 to be released, which he is unable to afford. *Id.* In his motion to reduce bond, he described his serious medical conditions and explained that they place him at a heightened risk of becoming critically ill if he contracts coronavirus. *Id.* at ECF p. 4–5 of 17. He also argued that it would violate his constitutional rights to keep him in custody during the coronavirus pandemic. *Id.* at ECF p. 13 of 17. On April 2, 2020, a state trial judge heard and denied Foster's motion. *See id.* at ECF p. 16 of 17.

The plaintiffs argue that Foster has sufficiently presented his request to the state courts and should not be required to do more. They acknowledge that he has not exhausted all avenues of state relief: he could appeal the state court's denial of his motion to reduce his bond, but plaintiffs do not contend that he done so. They argue, however, that the Court should excuse exhaustion based on the futility of an appeal or the Court's equitable authority to excuse exhaustion. They contend that an appeal would take weeks to pursue, making appellate remedies practically unavailable to him in light of the urgency of the coronavirus pandemic and causing an unreasonable delay that would force him to continue to suffer the alleged harm. In support of this contention, they offer an affidavit from Lester Finkle, the Chief of Staff to the Cook County Public Defender, who explains the procedure for interlocutory appeals of denials to modify bail. Pls.' Renewed Mot. for Prelim. Inj., Ex. C (dkt. no. 55-3). Under Illinois Supreme Court Rule 604(c), before a defendant can file such an appeal, he must file a verified motion in the trial court providing certain information about himself. *Id.* ¶ 2. Only after the trial court denies the verified motion can the defendant file an appeal. *Id.* The affidavit submitted by the plaintiffs reflects that this process typically takes two to four weeks. *Id.* ¶ 5. After that, if the appellate court denies the defendant's appeal, he can seek discretionary review in the Illinois Supreme Court. *Id.* ¶ 3. Based on this information, the plaintiffs argue that their state-court remedies are futile or practically unavailable and that requiring them to pursue these remedies would unfairly prejudice them.

The plaintiffs' contentions are not persuasive. Their only evidence, Finkle's affidavit, describes how long such an appeal would take under ordinary circumstances. But here we are not dealing with not ordinary circumstances. The affidavit does not adequately show how the state appellate process would be expected to work for a medically vulnerable detainee claiming that due to a global pandemic that has infiltrated the Jail, he faces immediate risk of serious health consequences unless his bail is reduced. We know the state courts are capable of dealing with emergency requests of this type promptly and efficiently; **\*991** Cook County trial court judges dealt quickly and efficiently with hundreds of such requests in late March, and they continue to do so now. There is no reason to believe that the Illinois Appellate Court would treat such an appeal as an ordinary, run-of-the-mill bail issue and would refuse to deal with it promptly. Although a court may excuse exhaustion in the unusual case where a state process would cause an unreasonable delay, *see, e.g., Gonzalez*, 355 F.3d at 1016, the plaintiffs have not established that this is so in the present situation.

To bring a class action, and by analogy a representative action, a plaintiff must show that the proposed class meets the four requirements of Rule 23(a): "numerosity, commonality, typicality, and adequate representation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). In addition, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Id.* at 345, 131 S.Ct. 2541. The plaintiffs here rely on, or analogize to, Rule 23(b)(2), which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

The parties dispute whether subclass A satisfies each requirement of Rule 23, as applied to representative actions, apart from numerosity. The Court discusses each disputed requirement in turn.

### a. Commonality

[11] [12] To establish that they are likely to satisfy the commonality requirement, the plaintiffs must show that there likely "are questions of law or fact common to" the members of subclass A. Fed. R. Civ. P. 23(a)(2). "That language is easy to misread." *Wal-Mart*, 564 U.S. at 349, 131 S.Ct. 2541. "Commonality requires the plaintiff[s] to demonstrate that the class members have suffered the same injury." *Id.* at 349–50, 131 S.Ct. 2541 (internal quotation marks omitted). In addition, "[t]heir claims must depend upon a common contention" for which the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350, 131 S.Ct. 2541. Thus "what matters...is not the raising of common 'questions' ...but rather, **\*993** the capacity of a [representative] proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* at 350, 131 S.Ct. 2541 (emphasis omitted). "Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014).

[13] Subclass A conditionally satisfies the commonality requirement because the plaintiffs likely can show that its members "suffered the same injury." *See Wal-Mart*, 564 U.S. at 349–50, 131 S.Ct. 2541. Specifically, the members of subclass A can show that the Sheriff's response to the coronavirus pandemic gave rise to their habeas claim. In addition, the plaintiffs point to several questions the determination of which, they contend, will resolve issues that are central to the validity of their habeas claim. For purposes of commonality, the Court need consider only one: whether coronavirus presents so severe a risk of harm to some people in the Sheriff's custody such it is unconstitutional to confine them in in the Jail. [6] In a representative proceeding, a common answer to that question likely would drive the resolution of the litigation by resolving a core issue underlying subclass A's request for a writ of habeas corpus.

[14] The Sheriff contends that subclass A cannot satisfy the commonality requirement because its members seek habeas corpus relief that would require individual proceedings or determinations. But issues pertaining to the individualized nature of the desired injunctive relief go to the requirements of Rule 23(b), not commonality. *See id.* at 360–62, 131 S.Ct. 2541; *Bell v. PNC Bank, Nat. Ass'n*, 800 F.3d 360, 379–80 (7th Cir. 2015). In other words, the commonality requirement of Rule 23(a) does not demand that the relief ultimately awarded to each plaintiff be the same. *See id.*; *Suchanek*, 764 F.3d at 756 (commonality of relief is not essential); *In re IKO Roofing Shingle Prod. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014) ("[The commonality requirement as discussed in] *Wal–Mart* has nothing to do with commonality of damages."). Nor is this a case in which the commonality requirement is not satisfied because individual plaintiffs experienced the harm in meaningfully different ways. *Cf. Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 497–98 (7th Cir. 2012) (class of disabled students did not meet commonality requirement where its members likely experienced alleged violations of federal and state law in different ways). The putative members of subclass A all experienced the alleged harm from the Sheriff's response to coronavirus in the same or similar ways, specifically their allegedly increased risk of exposure to the virus. In addition, all of them raise the same kind of claim, and their claims all involve a common question that would resolve a central issue of that claim.

The Court acknowledges that, in a case raising claims similar to the habeas corpus claims asserted in this one, another judge in this district recently took a different **\*994** approach with regard to commonality. A putative representative class of convicted

[18]  In actions where plaintiffs seek an injunction that "would merely initiate a process through which highly individualized determinations of liability and remedy are made," Rule 23(b)(2) is not satisfied. *Jamie S.*, 668 F.3d at 499 (7th Cir. 2012) (injunction that established a system for identifying disabled children and implementing individualized education plans and remedies did not satisfy Rule 23(b)(2) because it "merely establishe[d] a system for eventually providing individualized relief"). *Compare id.* and *Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 893 (7th Cir. 2011) (in case challenging insurer's performance of hail storm damage appraisals, injunction requiring class-wide roof reinspection did not satisfy Rule 23(b)(2) where it "would only initiate thousands of individualized proceedings to determine breach and damages") *with Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 441–42 (7th Cir. 2015) (proposed class was maintainable under Rule 23(b)(2) where plaintiffs asked the court for a declaration that a school board's policies violated Title VII and prospective relief including a moratorium on a challenged practice and the appointment of a monitor).

The plaintiffs concede that issuing writs of habeas corpus in this case would entail individualized proceedings but not that Rule 23(b)(2) precludes them from proceeding on a representative basis. They suggest that the type of supposedly brief, individualized proceedings they seek "have long been commonplace in class litigation." Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 23. But the cases they cite to support that proposition are distinguishable from this one. Both *Barnes v. District of Columbia*, 278 F.R.D. 14 (D.D.C. 2011), and *Dunn v. City of Chicago*, 231 F.R.D. 367 (N.D. Ill. 2005), *amended on reconsideration*, No. 04 C 6804, 2005 WL 3299391 (N.D. Ill. Nov. 30, 2005), involved individualized proceedings on damages under Rule 23(b)(3), not individualized proceedings for injunctive relief under Rule 23(b)(2). *See Barnes*, 278 F.R.D. at 19–23; *Dunn*, 231 F.R.D. 367, at 375–78. *Dunn* also involved class members who had variations in how they *experienced* the constitutional violations—an issue the court properly discussed as part of the commonality analysis, not the Rule 23(b)(2) analysis. *See id.* at 372.

[19]  Even if the plaintiffs did not concede it, individualized proceedings would be required for writs of habeas corpus that the plaintiffs seek because the Prisoner Litigation Reform Act (PLRA) applies to their habeas corpus claims. Under the PLRA, in tailoring any prospective or preliminary injunctive relief "in any civil action with respect to prison conditions," a court must "give substantial weight to any adverse impact on public safety," among other considerations. 18 U.S.C. § 3626(a)(1)(A), (a) (2). The PLRA defines "civil action with respect to prison conditions" as "any civil proceeding arising under **\*996** Federal law with respect to the conditions of confinement or the effects of actions by government officials on the lives of persons confined in prison, but does not include habeas corpus proceedings challenging the fact or duration of confinement in prison." *Id.* § 3626(g)(2). Thus if the plaintiffs' habeas claims constitute civil actions as defined by the PLRA, the Court would need to give substantial weight to the public safety of granting writs, which would require consideration of, among other things, any danger each individual member of subclass A poses to the public.

As the Court indicated in its TRO decision, the question of whether detained persons can even use a section 2241 petition to challenge the conditions of their confinement has divided courts. *Mays*, 453 F.Supp.3d at 1088–90 (comparing, e.g., *Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014) (a prisoner may challenge the conditions of his confinement in a federal habeas corpus petition) and *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008) (same) with *Spencer v. Haynes*, 774 F.3d 467, 469–70 (8th Cir. 2014) (section 2241 petitions may not challenge conditions)). The Seventh Circuit has expressed a "long-standing view that habeas corpus is not a permissible route for challenging prison conditions," at least when a prisoner's claim does not have "even an indirect effect on the duration of punishment." *Robinson v. Sherrod*, 631 F.3d 839, 840–41 (7th Cir. 2011). But the Seventh Circuit has also noted that "the Supreme Court [has] left the door open a crack for prisoners to use habeas corpus to challenge a condition of confinement." *Id.* at 840 (quoting *Glaus v. Anderson*, 408 F.3d 382, 387 (7th Cir. 2005)) (citing *Nelson v. Campbell*, 541 U.S. 637, 644–46, 124 S.Ct. 2117, 158 L.Ed.2d 924 (2004); *Bell v. Wolfish*, 441 U.S. 520, 526 n.6, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Preiser v. Rodriguez*, 411 U.S. 475, 499–500, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973)).

In the TRO decision, the Court said that it did not need to decide the question of whether the plaintiffs could challenge conditions of confinement in a habeas corpus proceeding definitively at the time but stated that were it "required to address this point, [the Court] would not consider it to be an absolute bar to plaintiffs' motion for a temporary restraining order." *Mays*, 453 F.Supp.3d at 1090. The Court stated that "[t]he plaintiffs' claims, as they have framed them, *do* bear on the duration of their confinement

success on the merits. Accordingly, the plaintiffs' request for the Court to release medically vulnerable members of subclass A on unsecured or non-monetary bail conditions pending review of their habeas corpus claims is moot.

**B. Section 1983 claim**

The Court next addresses the question of likelihood of success on the plaintiffs' section 1983 claim, dealing with conditional class certification first, followed by the merits. The Court then addresses certain provisions of the PLRA as applied to the section 1983 claim.

**1. Conditional class certification**

For their section 1983 claim, the plaintiffs seek class-wide relief in the form of a preliminary injunction. But because the plaintiffs only recently filed the lawsuit, there has not yet been a class certification ruling. As the Court indicated in its TRO opinion, "[t]his does not foreclose the possibility of relief for the plaintiffs at this stage, because a district court has general equity powers allowing it to grant temporary or preliminary injunctive relief to a conditional class." *Mays*, 453 F.Supp.3d at 1085 (citing *Lee v. Orr*, No. 13 C 8719, 2013 WL 6490577, at *2 (N.D. Ill. Dec. 10, 2013); *Al Otro Lado v. Wolf*, 952 F.3d 999, 1005 n.4 (9th Cir. 2020); *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 433 (6th Cir. 2012); *Howe v. Varity Corp.*, 896 F.2d 1107, 1112 (8th Cir. 1990)). "Furthermore, Federal Rule of Civil Procedure 23(b)(2) 'does not restrict class certification to instances when final injunctive relief issues' and permits certification of a conditional class for the purpose of granting preliminary injunctive relief." *Id.* (quoting *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012)).

As indicated, to bring a class action a plaintiff must show that the proposed class meets the four requirements of Rule 23(a): "numerosity, commonality, typicality, and adequate representation." *Wal-Mart*, 564 U.S. at 349, 131 S.Ct. 2541. In addition, "the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)." *Wal-Mart*, 564 U.S. at 345, 131 S.Ct. 2541. The plaintiffs rely on Rule 23(b)(2).

As an initial matter, the Court must clarify the scope of the class or subclasses for which the plaintiffs have sought certification. They assert count 1 under section 1983 on behalf of all putative members of a class consisting of "all people who are currently or who will in the future be housed in the Cook County Jail for the duration of the COVID-19 pandemic." Compl. (dkt. no. 1) ¶ 60. In their reply brief in support of their motion for a preliminary injunction, however, the plaintiffs indicate that they **\*999** also request injunctive relief for claims under section 1983 specifically for the putative members of proposed subclass B, which consists of "all people who are currently housed on a tier where someone has already tested positive for the coronavirus," *id.* ¶ 62. *See, e.g.*, Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 29 (requesting the transfer of members of putative subclass B). Accordingly, the Court takes this as meaning that, with respect to the section 1983 claim, the plaintiffs seek injunctive relief on behalf of both the overall class and subclass B.

[21] The parties dispute whether the class and subclass B satisfy each requirement of Rule 23, except for numerosity. The Court's analysis earlier in this opinion finding that subclass A (the subclass seeking habeas relief) satisfies the typicality and commonality requirements apply to the overall class and subclass B as well. Specifically, the class and subclass B satisfy the commonality requirement because their members "have suffered the same injury" and their claims "depend upon a common contention" for which class action proceedings will "generate common answers apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350, 131 S.Ct. 2541 (emphasis omitted). As with subclass A, the claims members of the class and subclass B raise at least one common question that satisfies Rule 23(a)'s commonality requirement: whether coronavirus presents so severe a risk of harm to those in the Sheriff's custody that their conditions of confinement are unconstitutional. For the reasons previously discussed, Rule 23(a)'s commonality requirement does not involve whether each member of the class would be entitled to identical relief.

[22] The Class and subclass B also satisfy Rule 23(a)'s typicality requirement. Each member's section 1983 claim arises from the Sheriff's response to the coronavirus pandemic—"the same event or practice or course of conduct"—and "is based on the same legal theory." *See Lacy*, 897 F.3d at 866 (alteration omitted).

at 706. More broadly, the Due Process Clause protects pretrial detainees, who "have not been convicted of anything," *1001 *Miranda v. County of Lake*, 900 F.3d 335, 350 (7th Cir. 2018), from conditions that "amount[ ] to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 2467, 192 L.Ed.2d 416 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 395 n.10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)); *Hardeman*, 933 F.3d at 823.

[27]  [28]  Here there is no question that the plaintiffs' claims involve conditions that are sufficiently serious to invoke the Fourteenth Amendment; the Sheriff does not argue otherwise. A pretrial detainee may establish a Fourteenth Amendment violation based on a condition, or combination of conditions, posing an "unreasonable risk of serious damage to [his] future health." *Henderson v. Sheahan*, 196 F.3d 839, 847 (7th Cir. 1999) (decided under Eighth Amendment "deliberate indifference" standard). *See Helling v. McKinney*, 509 U.S. 25, 33, 35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (Eighth Amendment case; "exposure of inmates to a serious, communicable disease" that poses a risk of future harm is a deprivation sufficiently serious to invoke constitutional protections). This is precisely where persons detained in the Jail find themselves. The coronavirus is indisputably present in the Jail. And the persons detained there are housed in settings that facilitate its transmission. This is true throughout the Jail, given the close proximity in which even single-celled detained persons are housed and the fact that they occupy common areas like bathrooms, showers, and dayrooms where other inmates congregate or have been present. And it is particularly true for detained persons who are doubled celled and those who are still housed in the dormitory units, where dozens (or more) spend twenty-four hours per day, or close to it, in the same room. It is equally undisputed that persons are detained in these settings with the knowledge of the Sheriff and his personnel, who have assigned them to live in these quarters while aware of the risks of virus transmission. All of this, taken together, is sufficient for the plaintiffs to have well more than a "better than negligible chance," *see Whitaker*, 858 F.3d at 1046, of establishing the threshold requirement of their due process claim—conduct that the Sheriff knows puts detainees at a significant risk of serious harm from coronavirus. *See Kingsley*, 135 S. Ct. at 2472; *Miranda*, 900 F.3d at 353. Meeting this threshold requirement of the due process standard does not require an intent to cause harm; it requires only knowledge of "the physical consequences" of one's conduct. *Kingsley*, 135 S. Ct. at 2472.

The primary dispute before the Court, and the point on which the Sheriff focuses his defense, involves the second requirement of a due process claim. To succeed on their claim, the plaintiffs must show that the Sheriff's conduct in addressing the risks posed by exposure to coronavirus is objectively unreasonable in one or more respects. *See, e.g., McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018). At the preliminary injunction stage, however, the plaintiffs are not required to prove this definitively; they are required only to establish a reasonable likelihood that they will ultimately succeed in proving it.

The plaintiffs concede that the Sheriff and others have taken significant steps to reduce the Jail's population and to decrease the number of persons housed in groups or double celled. They argue, however, that the Sheriff's actions do not go far enough and that detained persons continue to be unreasonably exposed to a risk of serious harm. The plaintiffs contend that social distancing is not being enforced in units where detained persons are single celled, given joint usage of showers, toilet facilities, and dayrooms. And, they say, social distancing is not even a possibility *1002 for the hundreds who are double celled or remain in dormitory units. The plaintiffs also contend that despite policies promulgated by the Sheriff, proper sanitation—in particular, frequent cleaning of surfaces and facilities used in common, distribution of cleaning materials to detainees, and so on—is not actually being carried out on the ground. Finally, the plaintiffs contend—and it is undisputed—that nothing has been done by the Sheriff to enable him to identify, in advance, detained persons with medical or other conditions that make them particularly vulnerable to serious illness should they contract the coronavirus.

The Sheriff argues that he and others have taken significant steps to reduce the risk to detained persons from coronavirus. One critical aspect of this is a very significant reduction in the overall population of the Jail, accomplished by bond reductions issued by judges and by expansion, to its limits, of the Sheriff's electronic home monitoring program. In addition, in recent weeks, there have been far fewer new detainees admitted on a daily basis than has been the case historically, presumably due to fewer arrests. At the same time, the Sheriff has taken steps to increase capacity, including by reopening previously shuttered buildings and parts of buildings within the Jail complex. Together, these actions have enabled the Sheriff to take further steps to separate persons who remain detained in the Jail. Specifically, a far greater percentage of detainees are now in cells by themselves. And far fewer are housed in the dormitory units than before, with many having been transferred to single-cell units. In addition,

That said, the ongoing risk to detained persons at the Jail, confirmed by increases in the number who have tested positive for coronavirus and the death of six detained persons from coronavirus disease as of April 23, is the backdrop against which the Court must view the Sheriff's conduct.

The Court begins with the question of social distancing. As the plaintiffs see it, a policy that fails to fully implement social distancing throughout the Jail—which indisputably has not happened—cannot possibly **\*1004** be considered an objectively reasonable response to the coronavirus outbreak there. At least until full social distancing is enforced, the plaintiffs contend, detained persons face an unacceptably high risk of death or serious harm to their health.

[37]  The Sheriff's position is likewise simple and straightforward. His implementation of a coronavirus response plan at the Jail complies, he says, with the CDC Guidelines, and for this reason his actions have been objectively reasonable. The Guidelines, he points out, do not require social distancing in correctional facilities where it is not feasible given physical space, population, and staffing. [8]  The plaintiffs respond that the CDC Guidelines are not a surrogate for constitutional due process requirements.

To support his position that compliance with the CDC Guidelines should effectively be dispositive, the Sheriff cites *Carroll v. DeTella*, 255 F.3d 470 (7th Cir. 2001). There the Seventh Circuit held that a convicted prisoner could not show that prison officials had been deliberately indifferent to his lack of access to safe drinking water, because radium concentrations in the prison's drinking water were at a level that the U.S. Environmental Protection Agency deemed at the time to be safe. *Id.* at 472–73. The court noted that because prisoners are not entitled to better quality of air, water, or environment than the general public, prisons do not have "a duty to take remedial measures against pollution or other contamination that the agencies responsible for the control of these hazards do not think require remedial measures." *Id.*

The Sheriff's reliance on *Carroll* is unavailing. First of all, the plaintiffs do not suggest any entitlement on the part of pretrial detainees to conditions that exceed health and safety standards applicable to the general public. But that aside, the CDC Guidelines, unlike the EPA standards relied upon in *Carroll*, do not say or suggest that compliance makes detained people safe. This is particularly so in view of the fact that the Guidelines include feasibility qualifiers, particularly in relation to social distancing. *See* CDC Guidelines at 1, 3, 4, 11. Given this limitation, the Guidelines are not the same as a safety standard set by a regulatory agency.

For their part, the plaintiffs suggest that the CDC Guidelines "shed no light" on whether the Sheriff's conduct has been objectively reasonable, in conformity with constitutional requirements. Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt. no. 64) at 10 (quoting *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 1996)). The Court disagrees with this as well. The plaintiffs rely to a significant extent on *Thompson*. There the court, considering a claim of excessive force against a police officer—a claim also determined by a standard of objective reasonableness—stated that a policy on the use of force established by the police department was "completely immaterial [on] the question of whether a violation of the federal constitution has been established." *Id.* at 454. But later, in *United States v. Brown*, 871 F.3d 532 (7th Cir. 2017), the Seventh Circuit clarified that *Thompson* simply means that a police department's own policies do not establish the standard of what is reasonable for purposes of the Constitution. *See id.* at 537 ("Despite its strong **\*1005** language, *Thompson* should not be understood as establishing a rule that evidence of police policy or procedure will *never* be relevant to the objective-reasonableness inquiry."). The court explained in *Brown* that, in the fact-intensive objective reasonableness analysis, evidence of national or widely used police policies could be relevant to helping a factfinder understand how a reasonable officer might have behaved under the circumstances that faced the defendant. *Id.* at 538. The court noted that the relevance of such policy evidence may turn on the "factual complexity" of the circumstances facing the defendant, and it may be less relevant in circumstances in which a factfinder can rely on common sense to determine the reasonableness of conduct. *See id.*

Here—unlike, perhaps, a relatively simple excessive force claim against an arresting officer—the circumstances facing the Sheriff in operating the Jail are quite complex. In these circumstances, guidance from an expert body like the CDC is beneficial in assessing the objective reasonableness of the Sheriff's conduct in the face of an ongoing outbreak. Indeed, in *Forbes*, the

- Detained persons who have tested positive for coronavirus and are recovering (what the Sheriff refers to as "convalescent tiers"), which the CDC Guidelines likewise authorize.

- Double-celled or dormitory-housed detainees for whom there is a documented determination by a medical or mental health professional that single-celling poses a risk of suicide or self-harm.

- Persons detained housed in a dormitory unit that is at less than fifty percent capacity, which the record reflects will permit adequate social distancing.

 - Detained persons committed, at the documented direction of a medical or mental health professional, to a group housing unit that is equipped for medical or mental health treatment, if but only if there is not available space in an appropriate housing **\*1007** or medical unit that permits full social distancing.

Detained persons housed in any of the listed "acceptable" arrangements will, however, need facemasks that are replaced at appropriate intervals and must be provided with instruction on how to use a facemask and the reasons for its use. They also must be instructed, at regular intervals, on the importance of social distancing.

[39]   The Court has omitted from the list above two categories of detained persons referenced in Executive Director Miller's affidavits and testimony: persons put into group housing or double celled because of conduct issues (including those who Miller referred to during his testimony as "our disorderly...population," Apr. 23, 2020 Tr. at 52:6) or for reasons associated with the PREA. On the record as it currently stands, the plaintiffs have a reasonable likelihood of succeeding on a contention that it is objectively unreasonable to effectively preclude social distancing for such persons. With regard to PREA detainees, the proposition that they cannot be single celled is counterintuitive, to say the least. [10] And with regard to individuals with conduct issues, without more the Court cannot say that there is an objectively reasonable basis to hold them in a setting that does not permit adequate social distancing. With regard to detained persons in these categories, the Court is willing to entertain a properly-supported request by the Sheriff to include them in the category of persons who may be appropriately detained in group housing, perhaps with appropriate distancing.

Beyond what the Court has described, the plaintiffs have not established a reasonable likelihood of success on their due process claims. Specifically, the Court is not prepared to say that it is constitutionally inappropriate, in light of the coronavirus pandemic, to detain persons in the Jail in any form of group housing or to detain them in single cells given the likelihood of multiple uses of common facilities and areas. This would be tantamount to saying that, in the present circumstances, the Constitution prohibits detaining people in jails. The plaintiffs have not established, and are not likely to be able to establish, that this is so.

[40]   Next, the Court addresses the plaintiffs' contentions regarding advance identification of detained persons who are especially vulnerable to severe illness or death if they contract the coronavirus. The Court remains unpersuaded that the plaintiffs have a reasonable likelihood of showing that this is objectively unreasonable and thus violative of those class members' constitutional rights. The plaintiffs' experts opined that screening is important so that vulnerable individuals can be monitored for symptoms. Miller explained, however, that any person with symptoms consistent with coronavirus disease is already provided immediate screening and treatment, and medical professionals treating such a person will have immediate access to his or her medical records (which include an inventory of medical conditions reported by the detained person upon intake or thereafter). Though, as the Court stated in its TRO decision, advance identification of persons with heightened vulnerability would appear to be a good practice and perhaps a best practice, the plaintiffs have not shown that failing to do so is, under the circumstances, objectively unreasonable.

**\*1008** Finally, the Court addresses the plaintiffs' request for extension of the TRO. The TRO required the Sheriff to establish and implement a policy regarding coronavirus testing; provide cleaning supplies to detainees and staff and soap and/or hand sanitizer to detained persons; establish and implement a policy regarding sanitization of frequently touched surfaces; and provide facemasks to all detained persons who are quarantined. *Mays*, 453 F.Supp.3d at 1099–1100. The plaintiffs ask the Court to

anything about whether the reduction of population is temporary or permanent."). Population reduction is the "whole point" of the transfers the plaintiffs seek—they propose to prevent or curb the spread of coronavirus to detained persons, and in particular those who are vulnerable, by reducing the Jail's population. *See id.* at 1125–26.

The transfers sought by the plaintiffs would constitute prisoner release orders for an additional reason: they would direct the release of detained persons out of the Jail. *See* 18 U.S.C. § 3626(g)(4). The plaintiffs contend that, for people confined at home at the direction of a state authority, a home may amount to a prison within the meaning of the PLRA. To be sure, the list of institutions that qualify as prisons under the PLRA is not limited to those specified in the statute. *Witzke v. Femal*, 376 F.3d 744, 753 (7th Cir. 2004) (confinement in a drug rehabilitation halfway house qualified as confinement in a correctional facility under the PLRA). But, as defined by the PLRA, a prison is a facility. *Id.* § 3626(g)(5). The common definition of a facility is "a building or establishment that [provides a service or feature of a specified kind]." [11] That does not appear to cover a person's home; a home, even one in which a person is residing subject to a court or law enforcement authority's order, is not a place that provides specified services or features. [12] It is hard to see the PLRA's **\*1010** definition of "prison" stretching that far. In addition, even if home confinement and/or electronic home monitoring constitutes imprisonment under state law (an issue the Court need not decide), an order mandating the transfer of prisoners out of the Jail to confinement in their homes likely would constitute a prisoner release order because it would "direct[ ] the release [of prisoners] from...a prison" to another place of confinement, 18 U.S.C. § 3626(g)(4).

[46] The plaintiffs, however, appear to take the position even if prisoner transfers have the effect of reducing the prison population, a single-judge court may order them where the basis for the order is not crowding or overcrowding. They may be correct. One of the PLRA's requirements for the entry of a prisoner release order by a three-judge panel is that "crowding is the primary cause of the violation of a Federal right." 18 U.S.C. § 3626(a)(3)(E)(i). Some courts have concluded that single-judge courts can order the transfers of prisoners, at least to other facilities, where the purpose of the transfer involves the prisoners' medical needs or vulnerabilities. *See Plata v. Brown*, No. C01-1351 TEH, 427 F.Supp.3d 1211, 1222–24, 1229–30(N.D. Cal. June 24, 2013) (ordering the transfer to other institutions of certain medically high-risk categories of prisoners out of two prisons where they were at risk of contracting Valley Fever, a disease not spread through human-to-human contact); *Reaves v. Dep't of Correction*, 404 F. Supp. 3d 520, 523–24 (D. Mass. 2019) (denying a stay pending appeal and explaining why the PLRA permitted the court to order the transfer of a quadriplegic prisoner to a medical facility equipped to care for him in *Reaves v. Dep't of Correction*, 392 F. Supp. 3d 195 (D. Mass. 2019), *appeal docketed*, No. 19-2089 (1st Cir. Nov. 4, 2019)); *see also Money*, 453 F.Supp.3d at 1124 n.11 (suggesting that a single-judge courts can order prisoner transfers for reasons other than crowding). This conclusion seems correct: because three-judge courts can order prisoner releases only where crowding is the primary cause of the violation of a federal right, 18 U.S.C. § 3626(a)(3)(E)(i), to ensure the vindication of people in custody's constitutional rights, the PLRA must be read to permit courts to order transfers where some other condition causes the violation of a constitutional right. *See Plata*, 453 F.Supp.3d at 1222–24.

But a single judge's ability to order a prisoner transfer for reasons other than crowding makes no difference in this case: the primary basis for the transfers the plaintiffs request is to reduce crowding in the Jail. *See Money*, 453 F.Supp.3d at 1226–27 (plaintiffs' suggestion that they did not seek a remedy for overcrowding "contradict[ed] the allegations of their complaint and their entire theory of the case"). To put it in simple terms, one of plaintiffs' core contentions is that their constitutional rights are being violated because social distancing, which they contend is crucial to protect their health, has not been or cannot be accomplished at the Jail. Social distancing is essentially the converse of overcrowding. Thus it is apparent that the plaintiffs' request for prisoner transfers or releases *is* based on overcrowding.

To be more specific, one of the central allegations in the complaint is that the crowded conditions in the Jail "ensure the continued[,] rapid, uncontrolled spread of COVID-19 within the Jail and beyond—because the Jail is not and cannot be isolated from the larger community" and "because the Jail is a crowded, congregate environment." Compl. (dkt. no. 1) ¶ 2; *see also, e.g., id.* at ¶¶ 20, 25–26, 30–35, 37–41, **\*1011** 46, 51. The plaintiffs hinge their legal arguments on the contention that "without a reduction of the Jail's population, the lives and safety of the persons confined there cannot be reasonably protected" because "social distancing is not possible with the current jail population." Pls.' Reply in Supp. of Renewed Mot. for Prelim. Inj. (dkt.

### a. Previous order requirement

**[48]** The Court starts with the previous order requirement. It previously entered an order for less intrusive relief by issuing the TRO. *Mays*, 453 F.Supp.3d at 1099–1101. The Sheriff contends that the TRO does not satisfy the PLRA's previous order requirement because it did not include an order requiring social distancing. In the TRO decision, the Court found that the plaintiffs had failed "to show a reasonable likelihood of success on their contention that the Sheriff is acting in an objectively unreasonable manner by failing to mandate full social distancing." *Id.* at 1095. The Court declined to order relief with respect to social distancing throughout the Jail but required the Sheriff to enforce social distancing in connection with the new detainee intake process. *Id.* at 1099–1100.

**[49]** The previous order requirement is "satisfied if the court has entered one order [that] 'failed to remedy' the constitutional violation." *Brown v. Plata*, 563 U.S. at 514, 131 S.Ct. 1910. Neither the statute nor the relevant case law suggests that a court must attempt all possible steps short of release before requesting the convening of a three-judge court. *See* 18 U.S.C. § 3626; *Brown*, 563 at 514–16, 131 S.Ct. 1910. And the PLRA does not require a previous order involving a particular type of remedy; instead, it simply requires a previous order that attempted but failed to remedy the constitutional deprivation itself. *See id.* In *Brown*, the Supreme Court affirmed an order of a three-judge court mandating a population limit for California's prison system as a remedy for constitutional violations in two class actions, one involving a class of prisoners with serious mental disorders and the other involving **\*1013** prisoners with serious medical conditions. *Id.* at 499, 502, 131 S.Ct. 1910. The Court found that district courts "acted reasonably when they convened a three-judge court," despite recent, ongoing plans to address the at-issue constitutional violations, because they "had a solid basis to doubt" that the "additional efforts...would achieve a remedy." *Id.* at 516, 131 S.Ct. 1910.

In the TRO, the Court ordered relief less intrusive than a prisoner release order. Specifically, it required the Sheriff to establish and implement policies regarding coronavirus testing and sanitation in the Jail, implement social distancing during the new detainee intake process, provide adequate soap and/or hand sanitizer and sanitation supplies, and provide facemasks to all detained persons who are quarantined. *Mays*, 453 F.Supp.3d at 1099–1101. Because the TRO has not remedied the overall claimed constitutional violation—deficient conditions in the Jail during a pandemic—it satisfied the PLRA's previous order requirement.

### b. Reasonable time requirement

**[50]** **[51]** Additionally, before a three-judge court is convened under the PLRA, the defendant must have "had a reasonable amount of time to comply with the previous court orders," as indicated. *Id.* § 3626(a)(3)(A)(ii). This provision "requires that the defendant have been given a reasonable time to comply with *all* of the court's orders." *Brown*, 563 U.S. at 514, 131 S.Ct. 1910 (emphasis added). In some situations, a court may need "to issue multiple orders directing and adjusting ongoing remedial efforts" while it "attempts to remedy an entrenched constitutional violation through reform of a complex institution." *Id.* at 516, 131 S.Ct. 1910. "Each new order must be given a reasonable time to succeed, [and] reasonableness must be assessed in light of the entire history of the court's remedial efforts." *Id.* But a court may request the convening of a three-judge court even while its remedial efforts are ongoing; otherwise, a court unreasonably would have "to impose a moratorium on new remedial orders" before a three-judge court considers the issuance of a prisoner release. *Id.*

In *Brown*, the Supreme Court found that defendants in the two consolidated cases had reasonable time to comply with court orders where one court had "engaged in remedial efforts" for five years and the other court had done so for twelve years. *Id.* Remedial efforts were ongoing when the district courts requested three-judge courts, but those ongoing efforts merely attempted "to solve the crisis" through the same "basic plan[s]" as earlier efforts. *Id.* at 515, 131 S.Ct. 1910. In one case, a special master the district court appointed to oversee remedial matters had issued over seventy remedial orders. *Id.* The courts had no "assurance[s]

### 5. Irreparable harm

**[54]** **[55]** **[56]** In addition to showing a likelihood of success on the merits, the plaintiffs must show that they will likely suffer irreparable harm without a preliminary injunction. *Whitaker*, 858 F.3d at 1044. Irreparable harm is "harm that cannot be repaired and for which money compensation is inadequate." *Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) (internal quotation marks omitted). The plaintiffs must show more than a "mere possibility" of harm but not that harm has already occurred or is certain to occur. *Whitaker*, 858 F.3d at 1045. "[A] remedy for unsafe conditions need not await a tragic event." *Helling v. McKinney*, 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993).

**[57]** The plaintiffs have satisfied this requirement. They have shown a likelihood that, without additional measures to expand and enforce social distancing and the continuation of measures aimed at enhancing sanitation of surfaces within the Jail and otherwise curbing the spread of coronavirus among detained persons, some of the class members will contract the virus. If they contract coronavirus, class members— particularly those over the age of sixty-five or with certain preexisting health conditions —risk severe health consequences, including death. These grave risks to health are not an insignificant possibility for the class members, all of whom are live in the Jail's congregate environment, where the coronavirus has been spreading for weeks and where detained persons—even those who sleep their own cells—share spaces like common areas and showers. Therefore, the plaintiffs have adequately shown a likelihood that they will suffer irreparable harm without a preliminary injunction.

### 6. No adequate remedy at law

The plaintiffs also must show that they have no adequate remedy at law should the preliminary injunction not issue. *Whitaker*, 858 F.3d at 1046. They are not required to show that a remedy is "wholly ineffectual" but rather "that any award would be seriously deficient as compared to the harm suffered." *Id.* Where harm cannot be practicably remedied by monetary damages, there is no adequate legal remedy. *See id.; Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003); *see also W.S.R. v. Sessions*, 318 F. Supp. 3d 1116, 1126–27 (N.D. Ill. 2018) (no adequate remedy of law to address harm from prolonging child's separation from parent). The plaintiffs have clearly shown that the risk of harm to their health and possibly their lives cannot be fully remedied through damages, and therefore they have shown that they have no adequate remedy at law.

### *1016 7. Balancing of harms

**[58]** **[59]** "Once a moving party has met its burden of establishing the threshold requirements for a preliminary injunction, the court must balance the harms faced by both parties and the public as a whole." *Whitaker*, 858 F.3d at 1054. The nature of the balancing analysis depends on the moving party's likelihood of success: the higher the likelihood, the more the balance tips in favor of granting injunctive relief. *Id.* Before issuing an injunction ordering a defendant to perform an affirmative act, which can impose "significant burdens on the defendant," a court must give "careful consideration [to] the intrusiveness of the ordered act, as well as the difficulties that may be encountered in supervising the enjoined party's compliance with the court's order." *Kartman*, 634 F.3d at 892 (discussing certification of a class seeking mandatory injunctive relief).

**[60]** The Sheriff argues that the balance of harms weighs against issuing a preliminary injunction because he is doing the best he can to contain the spread of coronavirus at the Jail, including, he contends, following the CDC Guidelines to the greatest extent possible. He argues that an order requiring him to implement more health and protective measures would be disruptive to his ongoing and persistent efforts to protect detainees from coronavirus. He also argues that the Court should defer to his expertise and judgment regarding the best policies and practices to implement at the Jail, particularly in light of the fundamental need for him to maintain internal security and order. *See Bell*, 441 U.S. at 547–48, 99 S.Ct. 1861. The plaintiffs contend that the risk of severe health consequences or death to the class members is so grave that it tips the balance of harms in favor of granting a preliminary injunction. Additionally, the plaintiffs argue the public's interest in containing outbreaks of coronavirus favors granting injunctive relief.

appropriate intervals, and the Sheriff must provide the users with instruction on how to use a facemask and the reasons for its use.

- The Sheriff shall establish by no later than April 29, 2020 and shall put into effect by no later than May 1, 2020 a policy precluding group housing or double celling of detained persons, except in the following situations:

  - Persons detained in tiers or dormitories currently under quarantine following a positive test for the **\*1018** coronavirus within the tier or dormitory ("quarantine tiers");

  - Detained persons who have tested positive for the coronavirus and are under medical observation ("isolation tiers");

  - Detained persons who have tested positive for coronavirus and are recovering ("convalescent tiers");

  - Double-celled or dormitory-housed detainees for whom there is a documented determination by a medical or mental health professional that single-celling poses a risk of suicide or self-harm;

  - Persons detained housed in a dormitory unit that is at less than fifty percent capacity; and

  - Detained persons committed, at the documented direction of a medical or mental health professional, to a group housing unit that is equipped for medical or mental health treatment, if but only if there is not available space in an appropriate housing or medical unit that permits full social distancing.

- Detained persons housed in any of the listed "acceptable" arrangements must be provided with facemasks that are replaced at medically appropriate intervals. The detained persons must be provided with instruction on how to use a facemask and the reasons for its use. They also must be instructed, at regular intervals, on the importance of social distancing.

- On May 1, 2020, the Sheriff shall file a report regarding his compliance with the terms of the preliminary injunction.

Finally, the Court will entertain submissions by the parties regarding the duration of the preliminary injunction, in particular the social distancing provisions. Typically, a preliminary injunction lasts until the trial on the merits, but the order the Court is entering is predicated on an underlying condition—the ongoing pandemic—that, one can hope, will not last indefinitely. Under ordinary circumstances, there is nothing constitutionally inappropriate about housing detained persons in groups and allowing them to come into contact with each other. Currently we are not living in ordinary circumstances—hence the preliminary injunction—but once matters return to something approaching normal, it may be appropriate to loosen the requirements of the injunction. The Court (either the emergency judge or the assigned judge) will address this with the parties at a future date.

## Conclusion

The Court grants the plaintiffs' motion for preliminary injunction in part and denies it in part as set out in this Memorandum Opinion and Order [dkt. no. 55].

## All Citations

456 F.Supp.3d 966

## Footnotes

**WESTLAW**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Sincerely,

Michael C. Mayo

Michael C Mayo
20181127027
2700 South California
Chicago, IL 60608

## CERTIFICATE OF SERVICE

The undersigned states that on July 13, 2023,
Plaintiff's Supplemental Production In Response To
Defendant's First Set Of Request For Production
were served via United States Postal Service to the
stated address below.

Michael C Mayo

Troy S. Radunsky
DeVore Radunsky
230 W. Monroe Suite 230
Chicago, IL 60606


Hon. M. David Weisman
Office Of Clerk Of The U.S. District Court
United States Courthouse
219 South Dearborn Street
Chicago, IL 60604